FIRST DIVISION

No. 1-08-1158

| | | |
|---|---|---|
| NILES TOWNSHIP HIGH SCHOOL DISTRICT 219, COOK COUNTY, ILLINOIS, | ) ) ) | Petition for Review of Order of the Illinois Educational Labor |
| Petitioner-Appellant, | ) ) | Relations Board |
| | ) | |
| v. | ) | No. 2003-UC-0007-C |
| | ) | |
| ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD and NILES TOWNSHIP SUPPORT STAFF, LOCAL 1274, IFT/AFT, AFL-CIO, | ) ) ) ) ) | |
| | ) | |
| Respondents-Appellees. | ) | |

PRESIDING JUSTICE ROBERT E. GORDON delivered the opinion of the court:

The issue in the case at bar is whether two employees are "confidential employee[s]" as defined by the Illinois Educational Labor Relations Act, (the Act) 115 ILCS 5/2(n) (West 2006). The Act permits educational employees to organize, but it excludes confidential employees from the collective bargaining unit. 115 ILCS 5/2(b) (West 2006).

The two employees at issue are: (1) a systems and networking engineer (SN engineer); and (2) a world-wide web communications assistant (WW assistant). The Illinois Educational Labor Relations Board already ruled that these two employees were not confidential employees, and it is this decision that the school district asks us to review.

No. 1-08-1158

## BACKGROUND

The petitioner is the Niles Township High School District 219, Cook County, Illinois (the District). In its petition to this court, the District challenged the classification of two of its employees as <u>not</u> confidential. The two respondents are the Illinois Educational Labor Relations Board (the Board), and the Niles Township Support Staff, Local 1274, IFT/AFT, AFL-CIO (the Union). The Board was the entity that ruled that the two employees were not confidential employees, thereby allowing them to become part of the Union.

Confidential employees are those employees (1) who assist management with respect to labor-relations policy; or (2) who have access to collective bargaining information . 115 ILCS 5/2(n) (West 2006). Thus, this background section will provide only those facts about the two employees that relate to their assistance or access. In addition, for the first test, the District must show that the supervisor whom the employee assists is someone who "formulate[s], determine[s] and effectuate[s]" management policies with regard to labor relations. 115 ILCS 5/2(n) (West 2006). In the case at bar, it is undisputed that the employees' supervisors fit this definition. Thus, this background will provide only those facts about the supervisors that relate to the employees' assistance and access.

### Procedural History

On May 30, 2003, the District submitted a petition to the Board, asking the Board to remove three existing computer positions from an existing bargaining unit because they were confidential positions. The three positions were the two positions at issue in this appeal, as well as the position of "Programmer Analyst."

2

On October 15, 2004, the administrative law judge issued a recommended decision, recommending that the petition be dismissed for several reasons. The judge found that: (1) the three positions were neither newly created nor substantially altered since the creation of the existing bargaining unit in 1999; (2) the claimed alteration, even if substantial, rendered the petition untimely, as measured from the alteration date of May 2001; (3) even if the alteration was substantial and the petition was timely, the alteration did not create genuine doubt as to whether the position should remain in the bargaining unit, because the employees' alleged access to collective bargaining information was not authorized.

On November 1, 2004, the District filed exceptions to the administrative law judge's recommended decision. In particular, the District claimed that a substantial alteration had occurred on January 6, 2003, when its Board of Education ratified an amendment to the District's computer use policy.

On June 16, 2005, the Board issued its final order, affirming the administrative judge's recommended decision. The Board refused to consider the alteration that the District claimed occurred on January 6, 2003, because evidence of it was not presented to the administrative law judge. Also, the District's current claim that, after January 6, 2003, the employees independently searched for violations of the District's computer use policy was contrary to the District's prior claim that these employees investigated only when directed to by the administration.

The Board also determined that "unit clarification petitions seeking to exclude allegedly statutorily excluded employees from a bargaining unit must be filed within a reasonable period of time after the unit begins to include allegedly statutorily excluded employees." The Board found

that because it "concluded that the unit clarification procedure was not appropriately employed, it [was] unnecessary *** to address whether the disputed employees [were] in fact confidential."

On November 13, 2006, the appellate court reversed the Board's decision, and remanded with instructions that the Board must conduct an evidentiary hearing. Niles Township High School District 219 v. Illinois Educational Labor Relations Board, 369 Ill. App. 3d 128, 143 (2006). In part I of the decision, we held that the District's rights to due process were violated, when it was not allowed to present evidence that its petition was filed within a reasonable period of time. Niles Township, 369 Ill. App. 3d at 136. In part II of the decision, we rejected the Board's determination that petitions had to be filed within a reasonable period of time. Niles Township, 369 Ill. App. 3d at 142. We held instead that there was no time limit. Niles Township, 369 Ill. App. 3d at 142-43.

Since our holdings addressed only the timeliness rulings, we stated that we took no position on (1) whether the employees at issue were confidential employees or (2) whether their job duties had substantially changed. Niles Township, 369 Ill. App. 3d at 137. We instructed the trial court on remand to consider "the additional facts submitted by the District in its exceptions." Niles Township, 369 Ill. App. 3d at 137.

Evidentiary Hearing

On July 23, 2007, the Board on remand held an evidentiary hearing, where the District presented five witnesses and introduced five exhibits. Two witnesses, Dr. Nanciann Gatta and Guy Ballard were supervisors. Gatta was the District's assistant superintendent for human resources; and Ballard was the District's director of technology. The administrative law judge

4

(ALJ) found that both Gatta and Ballard "formulate, determine and effectuate labor relations policy"; and that the Union in its appellate brief accepted the ALJ's findings. Thus, Gatta and Ballard's role with respect to labor relations policy is undisputed in this appeal.

The three remaining witnesses were employees in the contested positions: (1) Ms. Pat Giorgas, a world-wide web communications assistant; (2) Mr. Adnan Memon, a systems and networking engineer; and (3) Ms. Madeline Czervionke, a senior programmer analyst. The Board ruled that the third position was a confidential employee; but the Union did not challenge this classification on appeal. Since this position is not at issue on appeal, this order will not discuss facts concerning it.

The District's five exhibits were labeled A through E, and were as follows: (A) instructions by the District to its employees concerning acceptable computer use, dated 2001 to 2007; (B) crisis management memoranda for the technology department, dated 2007; (C) the technology department's budgets for the years 2004-2008; (D) the technology department's organizational chart, dated July 19, 2007; and (E) job descriptions for the contested positions, dated July 2007. All of the District's exhibits were admitted without objection, except for exhibit B, which was admitted over an objection as to relevance. The ALJ also had 7 ALJ exhibits that were admitted without objection.

At the start of the hearing, the parties orally entered three stipulations: (1) that the District was "an educational employer within the meaning of Section 2-A of the Act" (115 ILCS 5/2(a) (West 2006)); (2) that the Union was "an employee organization within the meaning of Section 2-C of the Act [115 ILCS 5/2(c) (West 2006)], and an exclusive representative within the meaning

No. 1-08-1158

of Section 2-D of the Act"(115 ILCS 5/2(d) (West 2006)); and (3) that "the bargaining unit is as set forth" in the [Board's] opinion and order."

World-Wide Web Communications Assistant

The job description in Exhibit E stated that the WW assistant was "responsible for the continuous development and maintenance of the District 219 web site to ensure information is current and meets District 219 standards and guidelines."

At the hearing, Ms. Pat Giorgas testified that she had been a WW assistant with the District for five years, and that she reported to Ms. Chris Bush, a manager who supervised Giorgas and "programmer analysts." Giorgas described her job duties as "develop[ing], implement[ing], troubleshoot[ing], [and] support[ing] all the internal and external web sites of the school district, as well as any databases that go along with that."

Giorgas testified that "part of [her] daily job routine" was "making sure that our teachers and staff follow the AUP policy." Giorgas explained that the "AUP" or Acceptable Use Policy, which she identified as Exhibit A, was "a policy that our employees have to follow and sign-off [sic][of when they come into the school district to use our computer systems." With respect to the AUP, her job was to "make[] sure that our staff or students or teachers don't post, you know, something bad onto the website that can affect us in a negative way." Giorgas did not draft or prepare the AUP.

Giorgas testified that there was an AUP in place when she started with the District in 2002, and that the AUP was enforced at that time but "[p]robably not to the extent as it was after it was revised." Giorgas helped to enforce the AUP by "do[ing] searches on [her] servers for

6

various things that could possibly violate the AUP." If she found a violation, she reported it either to her manager or the director of technology; but she was never at the meeting when the employee was accused, and never asked to present evidence. Giorgas testified that the programmer analyst and the network administrator also enforced the AUP. When asked whether she assisted the school administration "in a confidential capacity," Giorgas responded: "I guess."

Giorgas testified that she assisted with "backups" of stored information, which was "a mixture of everything on the server" and that there were no restrictions on her access to information. She read materials only when she needed to "troubleshoot." She implemented the program for attendance records, but she had "not done anything with [teacher] evaluations." Giorgas testified that there were sites that "probably do hold material that is confidential in nature" but she had not read them. She testified that she had never had an occasion to read any documents of Dr. Gatta's on the web.

Giorgas testified that different computer users had different levels of security access, and that she determined the level "related to the web servers." As a result, she had the capability to control other users' access to specific materials. She had complete control over "web-related" user names and passwords, and she had the capability to log on as another user without the user's knowledge. However, she could not read another person's email. She also had the capability to access the web portions of the District's network, as well as "[d]atabases holding personnel and personal information of employees," without another person being able to detect her access. Giorgas testified that the network engineer would have access to other users' email without their knowledge

7

Giorgas identified the District's Exhibit B as documents relating to "crisis management." She testified that this is "[s]omething we've put in place, just in case there was a crisis, we'd be able to keep our school district up and running [o]r bring it back up in the fastest way possible." Giorgas was on the crisis management team, and her job obviously related to "the web server." When asked if she had seen before all the materials in Exhibit B, she replied "I believe so."

On cross-examination, Giorgas testified that the description for her job in Exhibit E "pretty much" described her duties. There were seven people in her "area," and they all did troubleshooting. She testified that the other two positions at issue, the SN engineer and the senior programmer analyst, also had access to passwords. As far as backup materials were concerned, the SN engineer had "access to everything" and the programmer analyst had "access to certain things." When asked if she had ever, in the five years she had been working for the District, opened files relating to collective bargaining policies, Giorgas first testified "I don't know" and then she asked "what do you mean by collective bargaining?" Counsel then defined 'collective bargaining' as negotiations with the Union, and asked whether she would have "any reason" to read such a document. Giorgas testified: "To read it? No."

After cross-examination, the ALJ asked Giorgas some questions to clarify her role. Giorgas testified that she had access to six or seven of the District's servers, but not all of them. One of the servers to which she had access was "the database server which holds all the Human Resource information," including teacher advancements and grievances. When asked whether she had ever been asked to look at documents on any server relating to "negotiations between the employer and the Union" or to "grievances," she testified: "I don't remember coming across any."

8

## Systems and Networking Engineer

The job description in Exhibit E stated that the SN engineer was "responsible for daily operations of systems, servers and networking tasks as delegated by the Operations and Networking Administrator." The Operations and Networking Administrator is Marcello Sanz, who is the immediate supervisor of Adnan Memon, the SN engineer.

Adnan Memon, the District's SN engineer, testified that he had been in that position for six years and that he reported to the operations manager. He testified that his access was broader than that of Giorgas' access, and that he had "access to any and all kind of data, e-mail, backups, restores for data." Memon testified that his access to email could be detected by other employees, but that his access to data could not be detected.

Memon testified that he monitored the system for possible AUP violations as part of his "day-to-day job." When he discovered a violation, he reported it to his supervisor. There were "instances" where he was present when an employee was accused of violating the AUP.

Memon testified that he had seen collective bargaining information, but he had never been asked to read it, and he had never read it. He testified that he had never been asked to retrieve a document that related to negotiations or grievances.

## Supervisors' Testimony

Dr. Gatta testified that she was currently the District's assistant superintendent for human resources. Previously, she had been a teacher at the District and vice-president of the local teacher's union. Now, she served on the "Board of Education Policy Committee" which consisted only of herself and "Board of Education members." The committee made

recommendations to the board of education concerning "policies" that would eventually be adopted as "formal procedures." The administrator in charge of a particular department would then write administrative regulation to implement the board's policies.

Gatta testified that the individuals involved with collective bargaining were the "attorneys at the Board of Education and the cabinet-level administration." The "cabinet-level administration" was "a nine-person team" consisting of "the superintendent, the assistant superintendents, and the principals, and *** the director of technology *** our community relations administrator, and our head of security." The cabinet shared computer "folders," including folders labeled "strike information" and "negotiations." The negotiations folder contained "every single proposal," as well as "[s]trike-throughs, spreadsheets, whatever [they] developed to look at as a team."

Gatta testified that the three employees at issue in the hearing all worked for the director of technology. Gatta testified that, recently, she had saved a file with the new teacher handbook and that she could not locate it, and that Giorgas had found it on the server. Gatta testified that "Giorgas developed a database for HR [Human Resources] to use, which details all of our grievances, ULP, EEOC charges, anything of a legal nature related to HR." Gatta testified that while the three employees at issue could access her folders without her knowledge, they should not do that.

Gatta testified that Madeline Czervionke, a programmer analyst, told Gatta that the Union had asked Czervionke "in the past to get some access to some data." However, Gatta did not know if the person seeking access was a Union official because the programmer did not tell Gatta

who had asked. Gatta testified that the programmer did not access the data because "she knows that it's ethically wrong to access other people's drawers."

Gatta testified that during collective bargaining, she could ask one of the three employees at issue to put together spread sheets. As an example, she testified that she could ask for a spreadsheet on sick days, such as how many sick days does the average employee use and how many sick days are in the "sick day bank."

Gatta testified that, after she learned of the Union's "appeal after the Appellate Court decision," she sent the employees at issue "all memos that placed them back in the [bargaining] unit, paying Union dues, back on the salary schedules."

Guy Ballard, the District's director of technology, testified that he had been in that position for 8 years. He identified District's Exhibit D as the organizational chart of the technology department. Of the 25 people on the chart, five were excluded from the Union: (1) Ballard; (2) Ballard's secretary, Daphne Wilson; (3) Chris Busch, the applications administrator, to whom Pat Giorgas reported; (4) Phil Lacey, the manager of technology training; and (5) Marcello Sanz, the manager of operations and networking, to whom Adnan Memon reported.

Ballard testified that the three employees at issue worked at the District office, in offices adjacent to Ballard's office. Ballard identified Exhibit A as the District's authorized computer use policy (AUP); and Exhibit C as the technology budget. Ballard explained that the AUP "went through a radical review and change" in 2003, when "the Union and the District negotiated the contents" of the policy. Part of the policy provided that "[a]nyone who can identify a security breach on the web server must notify the webmaster or building administrator." Ballard identified

"the webmaster" as Giorgas.

Ballard testified that Memon, the SN engineer, was in charge of backing up all the information on the networks and saving it to backup tapes. Approximately a year and a half ago, or the end of 2005, Ballard decided to create a crisis plan for the District so that they "could then have a way to bring the District back on line in the case of a catastrophic event." Ballard identified Exhibit B as "the Reader's Digest version ** or the executive summary of the crisis management meetings that we had." While developing the crisis management policy, Ballard received assistance from the three contested employees. In addition, each of these employees carried a "thumb drive, to carry the essential documents that they would need to maintain their systems." A thumb drive is a USB drive that can be put on a key chain.

Ballard testified that he asked Giorgas, the WW assistant, to give him "a chart of when the teachers had last updated their web pages," which Ballard testified was a major issue in the last negotiation between the parties. Delinquent teachers were given a certain time period within which to update; and if they failed to update, their supervisors were contacted.

Ballard testified that, during the last negotiation, his department prepared "a plan to shut down the district in the case of a lockout or in case of a walkout *** to prevent inappropriate access to *** information during negotiations." Ballard asked Giorgas, the WW assistant, "to prepare a bare bones web site and put it in a separate server"; and he asked Memon, the SN engineer, "to make a final back up of everything and one last backup on the day that we were closing negotiations." Ballard asked the programmer analyst, who is not at issue in this appeal, to relinquish all of her passwords, and Ballard changed them "so everybody was essentially locked

out of the system at that point."   Ballard testified that when he locked these three employees out of their systems, they were "upset" and it created "bad feeling."

Board's and ALJ's Decision

On September 26, 2007, the ALJ issued a detailed 26-page recommended decision, in which she found that the programmer analyst was a confidential employee, but that the WW assistant and the SN engineer were <u>not</u> confidential employees.  The ALJ noted that the WW assistant and the SN engineer had never read any documents relating to negotiations.  In contrast, the ALJ observed that programmer analyst had been "asked to prepare reports for negotiations, which may include spreadsheets stating the cost of giving a specified amount in negotiations."  In addition, the ALJ quoted the programmer analyst's job description which stated that her duties included "'[d]evelop[ing] reports for Administration to use in collective bargaining.'"

On October 10, 2007, the District filed its exceptions to the ALJ's recommended decision. In particular, the District argued that employee disciplinary and grievance matters related to collective bargaining, and that the WW assistant and SN engineer's participation in enforcing the District's computer use policy rendered them confidential employees.

On April 7, 2008, the Board issued its opinion and order, affirming the ALJ's recommended decision in its entirety.  On May 6, 2008, the District filed a petition for review with this court, and this appeal followed.

ANALYSIS

At issue on this appeal is the Board's finding that both the SN engineer and the WW assistant were <u>not</u> confidential employees under the Act.  115 ILCS 5/2(n) (West 2006).

13

No. 1-08-1158

Since confidential employees are precluded from exercising the bargaining rights guaranteed by the Act, "courts must narrowly interpret the exclusion." Board of Education of Glenview Community Consolidated School District No. 34 v. Illinois Educational Labor Relations Board, 374 Ill. App. 3d 892, 898-99 (2006)(Glenview); One Equal Voice v. Illinois Educational Labor Relations Board, 333 Ill. App. 3d 1036, 1042 (2002). The party asserting the exclusion – normally the school district – has "the burden of producing sufficient evidence to support its position. Glenview, 374 Ill. App. 3d at 899.

The District appealed directly to this court, because a party seeking to contest a final order of the Board may do so only in an appellate court, and only in an appellate court "of a judicial district in which the Board maintains an office." 115 ILCS 5/16(a) (West 2006). Since the Board maintains an office in Chicago, this appeal directly to the First Judicial District was proper. Board of Trustees v. Illinois Education Labor Relations Board, 274 Ill. App. 3d 145, 153-54 (1995).

Standard of Review

"[T]he Board's determination as to whether the facts establish that an employee is a confidential employee as defined by statute will not be reversed, unless that determination was clearly erroneous." Glenview, 374 Ill. App. 3d at 899; Support Council of District 39, Wilmette, Local 1274, IFT-AFT, AFL-CIO v. Educational Labor Relations Board, 366 Ill. App. 3d 830, 833 (2006) (Wilmette). The clearly erroneous standard is highly deferential. Glenview, 374 Ill. App. 3d at 899; Wilmette, 366 Ill. App. 3d at 833. We will not reverse the board's determination about a confidential employee, unless our review of the entire record leaves us "'with the definite and firm conviction that a mistake has been committed." Glenview, 374 Ill. App. 3d at 899,

14

No. 1-08-1158

quoting <u>AFM Messenger Service, Inc. v. Department of Employment Security</u>, 198 Ill. 2d 380, 393 (2001).

The appellate court has considered in two prior cases whether computer employees were "confidential employees," and reached opposite conclusions, based in part on the deferential standard of review. In <u>Glenview</u>, a "technology administrative assistant" was found <u>not</u> to be a confidential employee. <u>Glenview</u>, 374 Ill. App. 3d at 904. By contrast, in <u>Wilmette</u>, a "networks manager" was found to be a confidential employee. <u>Wilmette</u>, 366 Ill. App. 3d at 838. Thus, there is no bright-line rule for computer employees.

In part, the opposite conclusions of these two cases can be understood in terms of the deferential standard of review. In <u>Glenview</u>, the Board found that the technology administrative assistant was <u>not</u> a confidential employee; and the appellate court affirmed the Board's ruling, as not clearly erroneous. <u>Glenview</u>, 374 Ill. App. 3d at 904. In <u>Wilmette</u>, the appellate court also affirmed the Board's ruling as not clearly erroneous, but in that case the Board had found that the network manager was a confidential employee. <u>Wilmette</u>, 366 Ill. App. 3d at 838. Thus, both cases were affirmations, based on a clearly erroneous standard of review.

Thus, the question for an appellate court is <u>not</u> how we would rule, if we had been standing in the Board's shoes, and writing in the first instance. The question for us is does the Board's decision stink like a "dead fish." <u>Glenview</u>, 374 Ill. App. 3d at 899, quoting <u>Parts & Electronic Motors, Inc., v. Sterling Electric Inc</u>., 866 F.2d 228, 233 (7th Cir. 1988) (for an appellate court to reverse under a clearly erroneous standard, the decision must "strike us as wrong with the force of five-week old, unrefrigerated dead fish").

15

No. 1-08-1158

        Although the parties agree that the proper standard of review is the 'clearly erroneous' standard, there is also precedent for applying the standard of 'against the manifest weight of the evidence.' Chief Judge of the Circuit Court of Cook County v. American Federation of State, County and Municipal Employees, Council 31, AFL-CIO, 153 Ill. 2d 508, 526 (1992) (holding that "the Board's decision was not against the manifest weight of the evidence"); Board of Education of Community Consolidated High School District No. 230 v. Illinois Educational Labor Relations Board, 165 Ill. App. 3d 41, 55 (1987) (Consolidated) (also applying a standard of "contrary to the manifest weight of the evidence"). Both standards are highly deferential. Under a 'manifest weight' standard, a reviewing court may still not "reweigh the evidence or make an independent determination of the facts." Consolidated, 165 Ill. App. 3d at 55. Thus, under either standard, the result is the same on the facts before us.

Tests for 'Confidential Employee' Status

        To be considered "confidential", the employee's position must qualify under either (1) the labor nexus test, or (2) the authorized access test. Wilmette, 366 Ill. App. 3d at 837. The two tests are taken from the definition of "confidential employee," contained in the Act:

> "'Confidential employee' means an employee, who (I) in the regular course of his or her duties, assists and acts in a confidential capacity to persons who formulate, determine and effectuate management policies with regard to labor relations or who (ii) in the regular course of his or her duties has access to information relating to the effectuation or review of the employer's collective bargaining

16

policies." 115 ILCS 5/2(n) (West 2006).

The labor nexus test is in clause (I) of the above-quoted section; the authorized access test is in clause (ii).

There is a third test, the reasonable expectations test, which is not at issue in this case. Wilmette, 366 Ill. App. 3d at 837; One Equal Voice, 333 Ill. App. 3d at 1044. This test asks whether there is a reasonable expectation that the employees at issue would perform confidential duties in a future collective bargaining process. Wilmette, 366 Ill. App. 3d at 837; One Equal Voice, 333 Ill. App. 3d at 1044. The reasonable expectations test applies only when a collective bargaining unit is not yet in place, but the employees at issue are expected to assume confidential responsibilities once the unit is established. Wilmette, 366 Ill. App. 3d at 837; Chief Judge, 153 Ill. 2d at 523, 528 ("[t]he reasonable expectation test should only be applied where the responsibilities may be reasonably expected but have not yet been assumed"). Since a unit was already established in the case at bar, the employees' duties are not speculative and this test does not apply. Wilmette, 366 Ill. App. 3d at 837.

Both the labor nexus test and the authorized access test use the phrase "in the regular course of his or her duties." 115 ILCS 5/2(n) (West 2006). Interpreting this phrase, the appellate court has held that "a person who performs confidential duties on a sporadic basis is still confidential." Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board (Plainfield), 143 Ill. App. 3d 898, 911 (1986). Thus, even if the computer employees in the case at bar had only sporadic access or nexus, they would still be considered confidential employees, so long as their access or nexus was part of their

17

No. 1-08-1158

normal duties. <u>Plainfield</u>, 143 Ill. App. 3d at 911.

Labor Nexus Test

Under the labor nexus test, an employee is a "confidential employee" if he or she "in the regular course of his or her duties, assists and acts in a confidential capacity to persons who formulate, determine and effectuate management policies with regard to labor relations." 115 ILCS 5/2(n) (West 2006).

The assistance must be "in a confidential capacity," and the confidential capacity must relate specifically to "labor relations." 115 ILCS 5/2(n) (West 2006); <u>Consolidated</u>, 165 Ill. App. 3d at 56 ("the confidentiality aspect of the 'labor nexus' test *** must relate specifically to the field of labor relations"). In this context, labor relations does not include hiring, performance or promotion or "mere access to personnel or statistical information," even if that information is confidential. <u>Consolidated</u>, 165 Ill. App. 3d at 62-63. The assistance must provide the employee with advance information about bargaining positions. <u>Consolidated</u>, 165 Ill. App. 3d at 61.[1]

In the case at bar, the ALJ found that the Union conceded that Dr. Gatta, the assistant

---

[1]In its appellate brief, the District cited page 61 of <u>Consolidated</u> for the proposition that personnel information, such as discipline of employees, handling of employee grievances and overseeing responses to unfair labor practices, were considered 'labor relations' policies under the statute. <u>Consolidated</u>, 165 Ill. App. 3d at 61. The cited page indicated just the opposite. The cited page stated that although the secretaries at issue acted in a confidential capacity with respect to such personnel matters as employee discipline, that did not mean that they were confidential employees within the meaning of the act. <u>Consolidated</u>, 165 Ill. App. 3d at 61

18

superintendent for human resources, and Mr. Ballard, the director of technology, formulated, determined and effectuated labor relations policy; and the Union in its appellate brief accepted the ALJ's findings. Thus that part of the labor nexus test can be taken as a given on this appeal.

After reading the entire record, we cannot find that the Board was clearly erroneous, when it found that Giorgas and Memon were not confidential employees under the labor nexus test. The record provides plenty of support for the Board's decision. For five and six years, respectively, Pat Giorgas and Adnan Memon worked as the WW assistant and SN engineer for the district. During all those years, the collective bargaining process was alive and well. In fact, during that time, by all accounts, there had been intense negotiation about the computer use policy.

Yet, Giorgas testified that during her five years, she had never once read a collective bargaining document, she had never once been asked to look at any collective bargaining documents, and she had never once had an occasion to read any documents of Dr. Gatta's on the web. When asked about collective bargaining, Giorgas had to ask for a definition. Similarly, Memon testified that during his six years as the SN engineer, he also had never read any collective bargaining information, and he had never been asked to retrieve a document relating to negotiations.

The sole reason for excluding confidential employees is to prevent those employees from feeling torn between two masters: the employer, on the one hand, who wants confidentiality for its bargaining strategy; and the union, on the other hand, who wants to learn that strategy to gain an advantage. Chief Judge, 153 Ill. 2d at 523. Our supreme court has stated unequivocally that

19

the sole "purpose of excluding confidential employees is to keep employees from 'having their loyalties divided' between their employer and the bargaining unit who represents them." Chief Judge, 153 Ill. 2d at 523. It is hard to see how Giorgas or Memon could have possibly felt torn about whether to expose their employer's strategy, when they themselves had no exposure to collective bargaining information during their entire five or more years of employment. Consolidated, 165 Ill. App. 3d at 61 ("the labor-nexus test is designed to protect against the premature disclosure of bargaining positions").

Not only does the Board's decision comport with the purpose behind the statute, it also comports with the letter of the statute itself. The language of the statute requires the employee's assistance to be "in a confidential capacity." 115 ILCS 5/2(n) (West 2006). When Giorgas was asked whether she assisted the school administration in a confidential capacity, the strongest answer that she could muster was "I guess." Giorgas testified that there were web sites that "probably do hold material that is confidential in nature," but she had never read them. Memon testified that it was his job to "backup and restore" data, which would include any confidential information on the server. However, the District, who had the burden of producing evidence, failed to ask Memon whether he ever read any confidential documents.

In addition to legislative purpose and statutory language, the Board's decision is also in line with case law. For example, in Wilmette, this court held that a network manager was a confidential employee, because that position was newly created and it was assumed that the manager would have to read confidential, collective bargaining documents in order to perform her duties. Wilmette, 366 Ill. App. 3d at 836. By contrast, in the case at bar, we do not have to

20

guess. We know for a fact that Giorgas and Memon do not have to read collective bargaining documents to perform their duties, because they have never read them during their five or more years of employment. Thus, the logic of the Wilmette case compels us to find that Giorgas and Memon are not confidential employees.

The District claims that computer use was a subject of negotiation; that Giorgas and Memon help to enforce the computer use policy by looking for violations and reporting them; and that Giorgas and Memon thereby assist in formulating labor relations policy.

Practically anything can be a subject of labor negotiations, from how many books a teacher is allowed to purchase to how many sick days she is permitted to take. The person who counts the books or the sick days does not thereby become a confidential employee, even though he or she is effectuating management policy. Similarly, the person who counts the number of times that a teacher uses her computer for an unauthorized use does not thereby become a confidential employee. Chief Judge, 153 Ill. 2d at 523 (recommending disciplinary action does not count as formulating, determining or effectuating labor relations policies). As already noted, access to information relating to hiring, performance, promotion, personnel or statistics does not turn an employee into a confidential one, for purposes of this statute. Consolidated, 165 Ill. App. 3d at 61-63.

When asked how the employees at issue provided assistance during collective bargaining, Dr. Gatta replied that she could ask them to provide spread sheets, such as a spread sheet on sick days. Giorgas had implemented the computer program for attendance records. Back in the pen and ink days, this court held that secretaries with full and regular access to personnel records were

not confidential employees. <u>Consolidated</u>, 165 Ill. App. 3d at 60- 61. This result does not change simply because Giorgas now tracks attendance and sick days on a computer.

The sick day spreadsheet is completely different in character from the spreadsheets prepared by the programmer analyst; and this difference is part of the reason why the ALJ found the programmer analyst to be a confidential employee, while finding that the other two employees were not. As the ALJ found, the programmer analyst was asked to prepare "spreadsheets stating the cost of giving a specified amount in negotiations," which gave her access to "what amounts the District is considering offering." The sick sheet spreadsheet did not provide the same type of insight. Far from being clearly erroneous, the underlying decision recognized important differences and drew a solomonic line.

The District also claimed in its appellate brief that Giorgas and Memon were "instrumental in developing" the District's computer use policy, but the record does not support the District's claim. Giorgas specifically testified that she did not draft or prepare the District's computer use policy; and the District failed to ask Memon whether he drafted or prepared the District's computer use policy. The District's appellate brief claimed that the director of technology testified that he had utilized Giorgas's and Memon's "knowledge" in drafting the policy. However, the use of the word "knowledge" on the cited transcript page had nothing to do with Giorgas's and Memon's "knowledge." Counsel asked whether the Union had "knowledge that people would be monitoring the use of e-mails and what teachers put on," and the director responded affirmatively.

The District also claimed in its appellate brief that Giorgas and Memon routinely assisted

the District in compiling information for both collective bargaining and employee grievance procedures, and cited in support the testimony of the director of technology. Again, the record does not support the District's claim. The director was asked a question that was compound in a couple of respects. First, it covered all three employees at issue in the hearing, while only two of those employees are at issue on this appeal. Second, the question asked about whether they had ever given the director information relating to either negotiations or grievance handling. When the director responded "routinely," he may have meant primarily grievance handling or primarily the third employee not at issue on this appeal. His following comment supports the inference that he meant primarily grievance handling, because he went out of his way to add "[p]articularly in the case of grievances."

The District also claims that Giorgas and Memon are confidential employees because they are part of the crisis management team that would keep the District's computer systems running in a skeletal fashion during a crisis and would bring the District's computer systems back to their full-functioning capacity after the crisis was over. However, their assistance in that sphere must be severely limited, because when the director of technology actually did bring the computer system "down to its minimum, its bare necessity," and presumably then brought it back up, the director locked both Giorgas and Memon out of the system.

After a careful review of the record, we conclude that there is plenty of support in it for the Board's conclusion that Giorgas and Memon were not confidential employees under the labor-nexus test.

Authorized Access Test

Under the authorized access test, an employee is a "confidential employee," if "in the regular course of his or her duties, [he or she] has access to information relating to the effectuation or review of the employer's collective bargaining policies." 115 ILCS 5/2(n) (West 2006). The access must be authorized; and the information must relate specifically to collective bargaining between labor and management. Wilmette, 366 Ill. App. 3d at 837. Examples of such information include the employer's bargaining strategy and actual collective bargaining proposals. Glenview, 374 Ill. App. 3d at 898. The access must also be in the regular course of the employee's duties. Glenview, 374 Ill. App. 3d at 904.

Although the word "authorized" does not appear in the statute, most cases that have interpreted this section of the statute have held that the access must be "authorized." Wilmette, 366 Ill. App. 3d at 837; Glenview, 374 Ill. App. 3d at 898 ("the employee's access to the information must be authorized"); Chief Judge, 153 Ill.2d at 523 (the employee must have "authorized access" to information "specifically related to the collective bargaining process"); County of Cook v. Illinois Labor Relations Board, 369 Ill. App. 3d 112, 124 (2006) (Cook County); One Equal Voice, 333 Ill. App. 3d at 1042.

The authorization part is so important that the name of the test is "the authorized access test." Wilmette, 366 Ill. App. 3d at 837; Chief Judge, 153 Ill.2d at 523; Cook County, 369 Ill. App. 3d at 124; One Equal Voice, 333 Ill. App. 3d at 1042. Thus, the issue is not what access an employee is capable of exercising, but what access the employer intends for the employee to exercise. Cook County, 369 Ill. App. 3d at 125 (employees were not confidential, although they

24

had "the means to access information related to collective bargaining," since the employer did not authorize it). Put simply, the issue is not capability but authorization.

There is no question that Giorgas and Memon had a lot of capability. Giorgas testified that she had the capability to access the web portions of the District's network, as well as databases holding personnel and personal information of employees, without another person being able to detect her access. Memon testified that his capability to access data was even greater than Giorgas' access.

Authorization is a different story. Dr. Gatta, the assistant superintendent for human resources, testified that, while Giorgas and Memon had the capability of accessing Gatta's files without Gatta's knowledge, they were not authorized to do that. Giorgas testified that she did not recall ever being asked, and thus authorized, to look at documents on any server relating to negotiations between the District and the Union, or relating to grievances. Giorgas testified that she had no reason to read such documents, and that she had never read any of Dr. Gatta's documents on the web. Glenview, 374 Ill. App. 3d at 902 (computer employee did not have authorized access to collective bargaining documents, where she had not been asked to troubleshoot those documents).

When Memon was asked on direct examination, whether his access to the District's systems was "authorized," he responded "yes." However, on cross-examination, when Memon was asked if he would read a confidential letter authored by Dr. Gatta, Memon testified that he would read the document only if he was instructed to do so. Memon also testified that he had never been asked to read or to retrieve a document relating to collective bargaining.

25

Giorgas and Memon's role was, in some ways, similar to the cleaning person who could open other people's desk drawers at night: while both the computer person and the cleaning person had the capability to read documents, neither was authorized to do so. Glenview, 374 Ill. App. 3d at 901-02 (cleaning person who emptied a superintendent's wastebasket was not a confidential employee). Dr. Gatta used the same analogy when she testified. Dr. Gatta explained that although the Union had asked a programmer to access files, the programmer did not do it, because "she knows that it's ethically wrong to access other people's drawers."

In addition to authorization, we must also consider actual access. Glenview, 374 Ill. App. 3d at 903-04 (access must be actual and in the regular course of duties). When a position has existed for a substantial amount of time, the Board will weigh heavily the employee's actual access to collective bargaining material. Glenview, 374 Ill. App. 3d at 901, 905 (substantial amount of time includes "more than a year"). If a computer person testifies that she has not read collective bargaining documents, then any access would be the result of mere chance. Glenview, 374 Ill. App. 3d at 901-02. In the case at bar, we know that chance is pretty slim, since Giorgas and Memon testified that they had never read or retrieved collective bargaining information in five years' time. Such theoretical access is insufficient. Glenview, 374 Ill. App. 3d at 903 (a computer employee was not a confidential employee, even though she "theoretically could have access to confidential collective bargaining information"). While sporadic access is sufficient, sporadic means sometimes, not never. Plainfield, 143 Ill. App. 3d at 911.

The access would also have to be a part of their regular duties. 115 ILCS 5/2(n) (West 2006); Glenview, 374 Ill. App. 3d at 903-04. Access was certainly not part of Giorgas and

26

Memon's regular duties where it did not happen in five years or more.

Our case is distinguishable from Wilmette, where the network manager was found to have access. Wilmette, 366 Ill. App. 3d at 838. First, as noted above, the posture on review was different, since in Wilmette, the Board had already found that the manager was confidential, and we could not find that this decision was clearly erroneous. Wilmette, 366 Ill. App. 3d at 838. Second, also as noted above, the position was newly created, so the court was forced to speculate on whether the employee would be required, and thus authorized, to read documents; whereas in our case, after five years, no speculation is needed. Wilmette, 366 Ill. App. 3d at 836. Third, in Wilmette, "it was envisioned" that the network manager would perform cost projections, relating specifically to negotiations with the union. Wilmette, 366 Ill. App. 3d at 833. By contrast, there is no evidence in our case that Giorgas or Memon performed such projections.

Based on the lack of authorization, the lack of actual access and the lack of access during regular duties, we cannot find that the Board was clearly erroneous when it concluded that Giorgas and Memon were not confidential employees under the authorized access test.

CONCLUSION

For the foregoing reasons, the order of the Board is affirmed. We cannot find that the Board's decision was clearly erroneous or against the manifest weight of the evidence.

Affirmed.

WOLFSON, and HALL, JJ., concur.

# REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
## (Front Sheet to be attached to each Opinion)

| | |
|---|---|
| **Please use the following form:** | ] |
| | ] **NILES TOWNSHIP HIGH SCHOOL DISTRICT 219, COOK COUNTY, ILLINOIS,** |
| | ] |
| | ] **Petitioner-Appellant,** |
| | ] **v.** |
| | ] |
| | ] **ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD and NILES TOWNSHIP SUPPORT STAFF, LOCAL 1274, IFT/AFT, AFL-CIO,** |
| | ] |
| | ] **Respondents-Appellees.** |
| **Complete TITLE of Case.** | ] |
| **Docket No.** | ]      **No. 1-08-1158** |
| | ] **Appellate Court of Illinois** |
| **COURT** | ] **First District, First Division** |
| | ] |
| | ] **DECEMBER 15, 2008** |
| **Opinion Filed** | ] **(Month, Day and Year)** |
| **JUSTICES** | ] **PRESIDING JUSTICE ROBERT E. GORDON delivered the opinion of the court.** |
| | ] **WOLFSON and HALL, JJ., concur.** |
| **APPEAL from the Circuit Court of Cook County; the Hon:_____ Judge Presiding** | ] Lower Court and Trial Judge(s) in form indicated in margin: ] Appeal from the Circuit Court of Cook County. ] Honorable  , Judge Presiding. |
| **For APPELLANTS John Doe of Chicago.** | ]Indicate if attorney represents APPELLANTS or ]APPELLEES and include attorneys of counsel. ]Indicate the word NONE if not represented. |
| **For APPELLEES, Smith and Smith, of Chicago.** | ]----------------------------------------------------------------- ] **Scariano, Himes and Petrarca, Chtd.** |
| | ] **Chicago Heights, Illinois   60411** |
| **Brown, of Counsel.** | ] **Attorneys for Appellant** ] **Attn: Anthony G. Scariano, Kimberly Payne and John A. Heintz** ]    **OF COUNSEL** ] |
| **Also add atty. for third party appellants or appellees.** | ] **Cornfield and Feldman** ] **Chicago, Illinois   60602** ] **Attorneys for Appellee, Local 1274, IFT/AFT, AFL-CIO** ] **Attn: Gilbert Feldman, Esq.** ]    **OF COUNSEL** ] |
| | ] **Lisa Madigan, Attorney General - State of Illinois** ] **Chicago, Illinois 60601** ] **Attorneys for Respondent, Illinois Educational Labor Relations Brd.** ] **Attn: John P. Schmidt** ]    **OF COUNSEL** |

No. 1-08-1158

**(USE REVERSE SIDE IF NEEDED**

**(USE REVERSE SIDE IF NEEDED**

29