2015 IL App (1st) 150794

No. 1-15-0794

Fifth Division
December 31, 2015

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE HEALTH AND HOSPITAL SYSTEM OF THE COUNTY OF COOK, | ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Petition for Administrative Review of a Decision and Order |
| ILLINOIS LABOR RELATIONS BOARD, LOCAL PANEL; ROBERT M. GIERUT, Chairman; CHARLES E. ANDERSON, Member; RICHARD A. LEWIS, Member; MELISSA MLYINSKI, Executive Director; and LOCAL 200, CHICAGO JOINT BOARD, RETAIL, WHOLESALE and DEPARTMENT STORE UNION, AFL-CIO, | ) ) ) ) ) ) ) ) ) | of the Illinois Labor Relations Board, Local Panel.  No. L RC 14 009 |
| Respondents. | ) ) | |

JUSTICE GORDON delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**OPINION**

¶ 1    The Health and Hospital System (HHS) of the County of Cook (the County), petitioner, appeals from a final order of the Illinois Labor Relations Board (the Board), granting Local 200, Chicago Joint Board, Retail, Wholesale and Department Store Union, AFL-CIO's (the Union's) petition to add ten recruiting positions to the existing bargaining unit. We affirm.

¶ 2        The sole issue in this appeal is whether ten recruitment and selection analysts (RSA) employed by a county hospital system are "confidential employees" as that term is defined in section 3(c) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/3(c) (West 2012)). The Act permits public employees to organize, but it excludes confidential employees from the collective bargaining unit. 5 ILCS 315/3(n) (West 2012).

¶ 3        The petitioner on appeal is the County. In its petition, the County challenged the Board's finding that RSAs, who are county employees, are *not* confidential employees. It is this decision that the County asks us to review. Respondents are: (1) the Board; and (2) the Union.

¶ 4                                            BACKGROUND

¶ 5        This case is a direct administrative review action from an order of the Board. The order granted the Union's majority interest representation petition, which sought to add the ten RSA positions at Stroger Hospital, an affiliate HHS, to the existing bargaining unit.

¶ 6        The Union filed its initial petition with the Board on April 2, 2014. The County filed a response opposing the petition, arguing that RSAs were prohibited by statute from joining the Union both as "confidential employees" as defined under section 3(c) of the Act, as well as "supervisors" under section 3(r) (5 ILCS 315/3(c), (r) (West 2012)). After an evidentiary hearing, an administrative law judge (ALJ) issued a recommended decision, finding that RSAs are neither confidential employees nor supervisors under the Act. Subsequently, the Board adopted the ALJ's findings in a written "Decision and Order," and granted the Union's petition to add RSAs to the bargaining unit.

¶ 7        The County does not contest the Board's finding that RSAs are not supervisors and, thus, at issue in this appeal is only whether RSAs are confidential employees. Accordingly, the

facts below are limited to those relevant to determining whether RSAs are confidential employees. As we discuss later in the analysis, confidential employees are those employees (1) who assist management with respect to labor-relations policy; or (2) who have access to collective bargaining information. 5 ILCS 315/3(c) (West 2012).

¶ 8                                    I. The Administrative Hearing

¶ 9         On July 18, 2014, an administrative law judge (ALJ) held a hearing to determine whether the ten RSAs were confidential or supervisory employees within the meaning of the Act, and were therefore prohibited from collective bargaining. During the hearing, the parties presented the following evidence relevant to determining whether RSAs are confidential employees.

¶ 10                                   A. RSA Job Description

¶ 11        The basic job responsibilities for the RSA position were detailed in an official job description from the Human Resources Department of HHS. The description contains a job summary which provides, in relevant part:

"Under minimal supervision of [(1)] the Bureau Chief of Human Resources, [(2)] Deputy Chief of Human Resources, and [(3)] Manager of Recruitment and Selections [the RSAs are] engaged in highly confidential screening, tracking and evaluation of job applicants' records relative to the recruitment and selection process for offices under the jurisdiction of County Board President. Utilizes the Automated Tracking Application System (ATAS) for applicant selection accuracy. Coordinates efforts with all areas of the Human Resources Bureau to ensure strict adherence to policies and procedures, Employment Plan guidelines and other protocols. Consults with Bureau Chief and Deputy as well as other management to review policies and identify where changes are needed to ensure

that established criteria relative to fair and objective hiring are met. May participate in the evaluation and testing of applicants, determine work priorities and train other staff in all operations relative to the recruitment and selections process."

¶ 12    The job description also includes a list of typical duties for the RSA position. RSAs implement "the policies and procedures established by the Human Resources Bureau and explain them to the general public, County's departmental personnel and other governmental agencies via telephone or in-person." RSAs additionally act "as a liaison to department heads in the preparation of current job descriptions and minimum qualifications necessary to qualify for select positions and to acclimate them to the policies and procedures associated with task analysis to produce job descriptions and job postings forms," and "[m]ay serve as a liaison on special advisory committees which analyze the various components of exams: establishing weighted values, determining test sites, scheduling exams, preparing exam materials, coordinating oral interviews, producing examination announcements, proctoring exams, rating test applicants and utilizing the ATAS[1] for applicant selection accuracy." RSAs also assist "hiring managers as it pertains to recruitment, staffing issues, policies and procedures," and conduct "reference checks and employment verification for review and approval." Lastly, an RSA will prepare an "offer letter for selected candidate in a timely fashion," and provide "basic benefit information to hiring managers and candidates."

¶ 13                    B. HHS Human Resources Department Organization Chart

¶ 14    The County provided the ALJ with an organization chart depicting the structure of the HHS Human Resources Department. It indicates that the Chief of the Department of Human Resources reports directly to the HHS Chief Executive Officer. The chief supervises a deputy

---

[1]As we observed in the prior paragraph, "ATAS" is an abbreviation for the "Automated Tracking Application System."

chief, who in turn oversees the five divisions of the Human Resources Department: "Learning and Development," "Labor and Employment Counsel" (Labor Team), "Workforce Development and Talent Acquisition," "Inpatient Support Services," and "Outpatient Support Services." The chart shows that class and compensation and recruiting employees, including RSAs, fall under Workforce Development and Talent Acquisition.

¶ 15                           C. Chief of Human Resources Testimony

¶ 16        At the administrative hearing, the ALJ first heard testimony from Gladys Lopez, the current Chief of Human Resources for HHS. In that capacity, her duties involved "managing the strategic vision of the department, executing policies, creating policies as part of the organizational strategy," and "working with department heads on various HR-related matters." As part of these responsibilities, she oversaw recruitment, labor, class and compensation, and operational matters. She testified that she attended some, but not all, labor negotiations in her role as human resources chief.

¶ 17        Lopez testified that she was familiar with RSAs and their role in the department. At the time of the hearing, there were approximately ten RSAs. Their basic duties involved posting job listings on "TALEO," HHS' online applicant tracking system.[2] TALEO includes job listings for which both internal candidates and external candidates may apply. However, to comply with existing collective bargaining agreements, the department must initially list vacancies on TALEO only for internal applicants. After a set period of time, the department may open vacancies to applicants outside HHS or the relevant bargaining unit. RSAs must ensure that HHS complies with any relevant collective bargaining agreements in making

_____

[2] When asked to explain what "TALEO" was, Lopez testified that: "TALEO is an online tracking system. It is the system that Cook County uses *** to post their vacancies for internal and external candidates to apply ***." However, she did not explain what the letters in "TALEO" stood for.

hiring decisions.

¶ 18     After listing a position on TALEO, the RSA reviewed submitted applications and evaluated applicants' qualifications against the minimum qualifications necessary for the position.

¶ 19     Next, the RSA prepared a "validated eligibility list" of candidates who met the qualifications. The RSA then submitted the list to the appropriate department head or hiring manager to begin the interview process. At this step, the RSA again determined that there was compliance with collective bargaining agreements. For example, Lopez testified, "for [a union such as] Local 200, *** while their employees may have applied, if they're not members of Local 200, they will not be given to the hiring manager, so the [RSA] has to also make sure that they are in compliance with the [bargaining agreement] to ensure that they only give Local 200 members to the hiring manager on an internal posting." This was the only stage in the recruitment process where RSAs could personally disqualify a candidate, but such a disqualification was generally final.  In sum, the RSA determines that the applicant is a member of the union.

¶ 20     In some cases, RSAs had a role in shaping minimum qualifications for certain vacancies that proved difficult to fill. "For example," Lopez testified, "if we see that we have posted a position several times externally and we are not getting candidates, we ask [RSAs] to conduct an analysis and provide the department head a reason why." The RSA then made recommendations to the department head regarding which qualifications could be adjusted to increase the applicant pool, or ensure a better fit for the department's needs. RSAs coordinated with departments looking to fill vacancies to "identify strategies" to meet their hiring needs.

¶ 21    Lopez testified that RSAs played a role in labor grievance procedures. Grievances generally arose when an applicant for employment or candidate for a change of a position, who did not reach the interview stage, or who was interviewed but not ultimately selected for a transfer or promotion, sought to contest the County's hiring decision. Grievances were first directed to the management labor team, consisting of the director, two labor attorneys, two labor assistants, and two labor analysts. This team reported to Lopez. If a grievance related to a recruitment issue, the labor team would contact the RSA responsible for that job listing. The RSA then researched the grievance, prepared a summary of the incident, and then meet with the labor team to discuss the results of their research. Lopez testified that if RSAs were included in the Union, and a Union member raised a grievance, the RSA would have to address a grievance from a member of his or her own union. An RSA sometimes testifies concerning grievances arising out of a hiring decision in which they were involved. An RSA could be called to testify in a grievance hearing where the grievant is a member of the Union.

¶ 22    Lopez testified that she was involved during collective bargaining between HHS and the Union. RSAs may be involved "[i]n connection with suggestions for job descriptions or postings or recruiting areas, posting, [and] the validation process," and "they have also started working with [the] class and comp[ensation] team on market studies" to determine what other organizations are paying for similar positions. Lopez testified that RSAs' input "potentially" affects HHS' bargaining strategy. She testified that RSAs have provided "some insight and some ideas" regarding "specific grievances around recruiting."

¶ 23    Lopez testified that RSAs had access to certain sensitive employment related information. RSAs could access "all employee information, all candidate information, all candidate salary history ***, salary benefits, home address, personal, confidential information that is within

[the] system." RSAs were also aware of positions that have not been posted on TALEO, but that HHS sought to fill in the near future.

¶ 24    RSAs were also responsible for proctoring exams when necessary to assess a candidate's fitness for a position. Through their role as a proctor, Lopez testified that RSAs "are aware of what the contents are of the exams, and they are aware of what the passing scores are, and they monitor and manage those processes." RSAs had previously participated in developing exams, and could potentially do so in the future.

¶ 25    Lopez testified that RSAs were involved in the interview process, including interviews for new hires as well as internal transfers and promotions. For positions within the Human Resources department, RSAs "attend" and "monitor" interviews and "make the decision to hire candidates." During interviews, RSAs do not evaluate the candidates themselves, but rather oversee the "interview process."

¶ 26    Lopez testified that HHS is currently finalizing an "employment plan," which will "provide not only the organization but the public with knowledge of the employment guidelines and processes and procedures." She testified that RSAs "will be responsible for ensuring that they adhere to the terms of the employment plan."

¶ 27                              D. RSA Testimony

¶ 28    The ALJ next heard testimony from Lamonda Kidd, an RSA who had held that position for one year and eight months. In that role, she partnered with HHS hiring managers to review job descriptions and revise them based on her input. She also attended interviews "to make sure the process is following the human resource practices."

¶ 29    She also testified as to her role in the grievance process. After receiving notice of the grievance, she began research "to determine which documents [she] may have reviewed,"

and "how [she] came about the decision that [she] reached." She testified that she "might do research regarding the position," for example, to determine what the minimum qualifications were. She would then prepare a packet with her findings, and provide it to the labor team. In at least one case, she also testified at a grievance hearing. She also testified that if she was a member of the Union, she would testify at grievance hearings brought by other Union members.

¶ 30    Kidd also testified about her access to employment related information through TALEO. She had access to applicants' addresses, home phone numbers, and social security numbers. If an applicant was a current or former HHS employee, she would have access to their salary information. She testified that RSAs, human resources assistants, the talent manager, and "other individuals in the recruitment department" have access to TALEO, but that RSAs use the database the most.

¶ 31    On cross-examination, Kidd testified that she only becomes involved with a grievance when requested to do so by higher management. She testified that during the grievance process, she might be asked whether the grievant met the minimum qualifications for a particular position, but not whether the listed requirements were appropriate or not. She testified that while she might have "an interest" in a grievance's outcome, settling them is not part of her job responsibilities as an RSA.

¶ 32                          E. Talent Acquisition Manager Testimony

¶ 33    The ALJ next heard testimony from Geraldine Evans, a Talent Acquisition Manager within the Human Resources department. She testified that in that role she oversees the recruiting department, including training, writing reports, restructuring the department, and "oversee[ing] the day-to-day operations of recruiting."

¶ 34    Evans also testified regarding the RSA's role in the department. She testified that "they post job descriptions in the TALEO system, they validate the applicants that apply in the TALEO system. If the posting warrants a test, they test for those postings before we get an actual eligible list that we send to the department for interviewing."

¶ 35    Once a hiring manager decided to hire a candidate, Evans testified that the RSA will "review the decision to hire and make sure that it is a legitimate hire, making sure that they did not select someone that has more seniority over someone else without an excellent justification." "If there is not a good justification there, they are supposed to go back to the hiring manager and say we cannot hire this person without more or a better or a significant justification why you selected this candidate over that candidate."

¶ 36    Evans testified as to the RSA's role in the grievance process. She testified that, on at least one occasion, an RSA determined that a grievance had merit. Evans testified that she was also aware of grievances that had been "reversed" based on an RSA's recommendation. She testified that RSAs work on grievances brought by members of the Union.

¶ 37    Evans testified that RSAs sit on interview panels, but only when the Human Resources department is hiring for internal positions.

¶ 38    Evans added that RSAs also proctor exams, and collectively oversee three human resources assistants.

¶ 39                                II. Board's and ALJ's Decision

¶ 40    On November 17, 2014, the ALJ issued a detailed 15-page recommended decision, in which he found that RSAs were not confidential employees under either of the two applicable tests under the Act. He also found that RSAs are not supervisors under the Act, a finding that the County does not dispute in this appeal.

¶ 41 The ALJ found that RSAs are not confidential employees under the labor nexus test[3] because the County failed to establish that either Gladys Lopez or the human resources labor team formulates, determines, and effectuates labor relations policies. The County additionally failed to establish that the RSAs assist Lopez or the labor team in a confidential capacity in the regular course of their duties. Further, he found that "RSAs' work with grievances is only tenuously related to the Employer's labor relations policies."

¶ 42 The ALJ also found that RSAs are not confidential employees under the authorized access test.[4] Although the County demonstrated that RSAs have access to information "possibly sensitive or of interest to a union," that information was "not shown to be specifically pertinent to the Employer's collective bargaining strategy."

¶ 43 After the ALJ issued his recommended decision, the County timely filed exceptions pursuant to section 1200.1 of the Rules of Regulations of the Illinois Labor Relations Board (80 Ill. Adm. Code, § 1200.135 (2003)), and the Union filed a response.

¶ 44 On February 23, 2015, after reviewing the hearing record, exceptions, and response, the Board issued its final "Decision and Order." In its written order, the Board adopted the ALJ's findings that RSAs were not confidential employees, and thus granted the Union's petition to

[3]As we discuss at greater length in section IV of the Analysis, under the labor nexus test, an employee is a "confidential employee" if he or she "in the regular course of his or her duties, assists and acts in a confidential capacity to persons who formulate, determine, and effectuate management policies with regard to labor relations." 5 ILCS 315/3(c) (West 2012); *Niles Township High School District 219 v. Illinois Educational Labor Relations Board*, 387 Ill. App. 3d 58, 71 (2008).

[4]As we discuss at greater length in section V of the Analysis, under the authorized access test, an employee is a "confidential employee," if "in the regular course of his or her duties, [he or she] has authorized access to information relating to the effectuation or review of the employer's collective bargaining policies." 5 ILCS 315/3(c) (West 2012); *American Federation of State, County & Municipal Employees, Council 31 v. Illinois Labor Relations Board*, 2014 IL App (1st) 132455, ¶ 34.

add the ten RSA positions to the bargaining unit.

¶ 45    On March 2015, the County timely filed its petition for direct review by this court,

pursuant to section 9(i) of the Act. 5 ILCS 315/9(i) (West 2012). This appeal follows.

¶ 46                                    ANALYSIS

¶ 47    At issue on this appeal is the Board's finding that RSAs are not confidential employees

under the Act. 5 ILCS 315/3(c) (West 2012).

¶ 48                                  I. Jurisdiction

¶ 49    The County appealed directly to this court, because a party seeking to contest a final

order of the Board may "apply for and obtain judicial review in accordance with provisions

of the Administrative Review Law, *** except that such review shall be afforded directly in

the Appellate Court for the district in which the aggrieved party resides or transacts

business." 5 ILCS 315/9(i) (West 2012). Since the County transacts business in the County of

Cook, this appeal directly to the First District was proper.

¶ 50                              II. Standard of Review

¶ 51    Since confidential employees are precluded from exercising the bargaining rights

guaranteed by the Act, courts must narrowly interpret the exclusion. *American Federation of

State, County & Municipal Employees, Council 31 v. Illinois Labor Relations Board*, 2014 IL

App (1st) 132455, ¶ 31 (*American Federation*); *Niles Township High School District 219 v.

Illinois Education Labor Relations Board*, 387 Ill. App. 3d 58, 68 (2008) (*Niles Township*);

*Board of Education of Glenview Community Consolidated School District No. 34 v. Illinois

Educational Labor Relations Board*, 374 Ill. App. 3d 892, 898-99 (2007); *One Equal Voice*

*v. Illinois Educational Labor Relations Board*, 333 Ill. App. 3d 1036, 1042 (2002).[5] The party asserting the exclusion has "the burden of producing sufficient evidence to support its position." *Glenview*, 374 Ill. App. 3d at 899. Thus, the County has the burden of proof.

¶ 52    "[T]he Board's determination as to whether the facts establish that an employee is a confidential employee as defined by statute will not be reversed unless that determination was clearly erroneous." *Glenview*, 374 Ill. App. 3d at 899; *Support Council of District 39 v. Illinois Educational Labor Relations Board*, 366 Ill. App. 3d 830, 833 (2006) (*Wilmette*); *Department of Central Management Services/The Department of State Police v. Illinois Labor Relations Board, State Panel*, 2012 IL App (4th) 110356, ¶ 15. The clearly erroneous standard is highly deferential. *Glenview*, 374 Ill. App. 3d at 899; *Wilmette*, 366 Ill. App. 3d at 833. We will not reverse the board's determination about a confidential employee, unless our review of the entire record leaves us " 'with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Glenview*, 374 Ill. App. 3d at 899 (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393 (2001)).

¶ 53    Although the parties agree that the proper standard of review is the 'clearly erroneous' standard, there is also precedent for applying the standard of 'against the manifest weight of the evidence.' See, *e.g.*, *Chief Judge of the Circuit Court of Cook County v. American*

_____

[5] The Illinois Educational Labor Relations Act (Educational Labor Act) has the same definition of "confidential employee" as the Act (115 ILCS 5/2(n) (West 2012)), and reviewing court decisions in cases arising under the Educational Labor Act generally apply with equal force to cases arising under the Act. See, *e.g.*, *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191 (1998); *Chief Judge of the Circuit Court of Cook County v. American Federation of State, County, & Municipal Employees, Council 31, AFL-CIO*, 218 Ill. App. 3d 682, 699-700 (1991), *aff'd*, 153 Ill. 2d 508 (1992).

*Federation of State, County & Municipal Employees, Council 31, AFL-CIO,* 153 Ill. 2d 508, 525 (1992) (holding that "the Board's decision was not against the manifest weight of the evidence"); *Board of Education of Community Consolidated High School District No. 230, Cook County v. Illinois Educational Labor Relations Board,* 165 Ill. App. 3d 41, 55 (1987) (*Consolidated*) (also applying a standard of "contrary to the manifest weight of the evidence"). Both standards are highly deferential. Under a "manifest weight" standard, a reviewing court may still not "reweigh the evidence presented or make an independent determination of the facts." *Consolidated,* 165 Ill. App. 3d at 55. Under either standard, the result is the same on the facts before us.

¶ 54                        III. Tests for "Confidential Employee" Status

¶ 55        To be considered "confidential," the employee's position must qualify under either (1) the labor nexus test, or (2) the authorized access test. *Wilmette,* 366 Ill. App. 3d at 837. The two tests are taken from the definition of "confidential employee," contained in the Act:

> " 'Confidential employee' means an employee who, in the regular course of his or her duties, assists and acts in a confidential capacity to persons who formulate, determine, and effectuate management policies with regard to labor relations or who, in the regular course of his or her duties, has authorized access to information relating to the effectuation or review of the employer's collective bargaining policies."
>
> 5 ILCS 315/3(c) (West 2012).

¶ 56        There is a third test, the reasonable expectations test, which is not at issue in this case. *Wilmette,* 366 Ill. App. 3d at 837; *One Equal Voice,* 333 Ill. App. 3d at 1044. This test asks whether there is a reasonable expectation that the employees at issue would perform confidential duties in a future collective bargaining process. *Wilmette,* 366 Ill. App. 3d at

837. The reasonable expectations test applies only when a collective bargaining unit is not yet in place, but the employees at issue are expected to assume confidential responsibilities once the unit is established. *Wilmette,* 366 Ill. App. 3d at 837; *Chief Judge,* 153 Ill. 2d at 528 ("[t]he reasonable expectation test should only be applied where the responsibilities may be reasonably expected but have not yet been assumed"). Since a unit was already established in the case at bar, the employees' duties are not speculative and this test does not apply. *Wilmette,* 366 Ill. App. 3d at 837.

¶ 57                                    IV. Labor Nexus Test

¶ 58        Under the labor nexus test, an employee is a "confidential employee" if he or she "in the regular course of his or her duties, assists and acts in a confidential capacity to persons who formulate, determine, and effectuate management policies with regard to labor relations." 5 ILCS 315/3(c) (West 2012); *Niles Township*, 387 Ill. App. 3d at 71. Thus, the party seeking to classify an employee as confidential must: (1) identify a person who formulates, determines, and effectuates labor relations policies; and (2) show that the employee subject to the classification assists that person in a confidential capacity in the regular course of his or her duties. See, *e.g.*, *Niles Township*, 387 Ill. App. 3d at 71 (finding that, since petitioner conceded that two individuals formulated, determined and effectuated labor relations policy, the remaining question under the labor nexus test was whether the contested employees assisted those two individuals in a confidential capacity in the regular course of their duties).

¶ 59        The assistance must be "in a confidential capacity," and the confidential capacity must relate specifically to "labor relations." 5 ILCS 315/3(c) (West 2012); *Consolidated,* 165 Ill. App. 3d at 56 ("the confidentiality aspect of the 'labor nexus' test *** must relate specifically to the field of labor relations"). In this context, "labor relations" does not include hiring,

performance or promotion or "mere access to personnel or statistical information," even if that information is confidential. *Consolidated,* 165 Ill. App. 3d at 62-63. The assistance must provide the employee with advance information about collective bargaining positions. *Consolidated,* 165 Ill. App. 3d at 61.

¶ 60    In the case at bar, the Board found that RSAs were not confidential employees under the labor nexus test, per the ALJ's recommended decision. In the ALJ's decision, he found that the County failed to establish that either Gladys Lopez or the labor team formulated, determined, and effectuated labor policies. Additionally, he found that the County failed to show that the RSAs assisted either Lopez or the labor team in a confidential capacity in the regular course of their duties as RSAs. Thus, the Board determined that the County failed to present sufficient evidence to prove either element of the test. After extensively reviewing the record, we cannot find that the Board clearly erred when it made these findings, and we affirm the Board's decision that RSAs are not confidential employees under the labor nexus test.

¶ 61    The County argues that the Board's decision was clearly erroneous because Lopez "is primarily responsibility for all labor relations matters, and directly oversees the work of the Employer's labor team." In support of this position, the County cites a previous Board decision, *American Federation of State, County & Municipal Employees, Council 31*, 26 PERI ¶ 114 (ILRB Local Panel 2010), for the proposition that job functions that constitute formulating, determining, and effectuating labor relations include "making recommendations with respect to the employers' collective bargaining agreement and evaluating union proposals, providing feedback to union proposals, and making proposals through labor liaisons." However, with the exception that Lopez does in fact oversee the human resources

16

labor team, the record provides scant support for any of these claims regarding Lopez's role in formulating, determining, and effectuating labor relations policy.

¶ 62    Lopez's testimony establishes at best a tenuous connection between her role as human resources chief and the department's labor relations policy. She testified that she has "attended" negotiations with two unions in the past, but that she does not currently sit on any negotiating team. She also testified that she "creates" and "executes" "policies as part of the organizational strategy." As the ALJ noted in his recommended decision, merely "attending" negotiations is not sufficient to show that Lopez formulates, determines, or effectuates labor relations policy. Further, although in her role as chief, Lopez undoubtedly creates and executes certain policies, her testimony provided no particular examples of such policies. Nor did she even claim that they were related to collective bargaining.

¶ 63    Insofar as the labor team might have a role in formulating, determining, and effectuating labor relations policies, the record fails to establish that claim. The record details only the labor team's role in addressing individual labor grievances. There is no evidence to support the proposition that the labor team develops or implements collective bargaining policies for the human resources department.

¶ 64    "The purpose of the confidential exclusion is to prevent employees from having their loyalties divided between the employer, who expects confidentiality in labor relations matters, and the union, which may seek disclosure of management's labor relations material to gain an advantage in the bargaining process." *Chief Judge*, 218 Ill. App. 3d at 698. If the County cannot establish that either Lopez or the labor team formulated, determined, and effectuated policies directly tied to the department's bargaining positions, they have failed to prove that RSAs are confidential employees under the Act.

17

¶ 65        Additionally, the County has not shown that the RSAs assist Lopez or the labor team in a confidential capacity. RSAs do not report directly to Lopez or the labor team. Lopez testified that RSAs may provide input regarding labor policy "[i]n connection with suggestions for job descriptions or postings or recruiting areas, posting, [and] the validation process," and that the RSAs' input "potentially" affects HHS' bargaining strategy. She testified that RSAs have provided "some insight and some ideas" regarding "specific grievances around recruiting." Testimony from Lamonda Kidd and Geri Evans admittedly details the RSAs' potentially substantial assistance to the labor department in addressing individual employment grievances. However, our case law has established that the assistance must be closely tied to "labor relations," which does not include hiring, performance or promotion or "mere access to personnel or statistical information," even if that information is confidential. *Consolidated,* 165 Ill. App. 3d at 62-63. Rather, as we have noted, the assistance must provide the contested employee with advance information about collective bargaining positions or strategies. *Niles Township*, 387 Ill. App. 3d at 71; *Consolidated,* 165 Ill. App. 3d at 61. Accordingly, we cannot say that the Board's decision that RSAs are not confidential employees under the labor nexus test was clearly erroneous.

¶ 66                                V. Authorized Access Test

¶ 67        Under the authorized access test, an employee is a "confidential employee," if "in the regular course of his or her duties, [he or she] has access to information relating to the effectuation or review of the employer's collective bargaining policies." 5 ILCS 315/3(c) (West 2012); *American Federation*, 2014 IL App (1st) 132455, ¶ 34. The access must be authorized; and the information must relate specifically to collective bargaining between labor and management. *Wilmette,* 366 Ill. App. 3d at 837. Examples of such

18

information include the employer's bargaining strategy and actual collective bargaining proposals. *Glenview,* 374 Ill. App. 3d at 898. The access must also be in the regular course of the employee's duties. *Glenview,* 374 Ill. App. 3d at 904.

¶ 68      Most cases that have interpreted this section of the statute have held that the access must be "authorized." *Wilmette,* 366 Ill. App. 3d at 837; *Glenview,* 374 Ill. App. 3d at 898 ("the employee's access to the information must be authorized"); *Chief Judge,* 153 Ill. 2d at 523 (the employee must have "authorized access" to information "specifically related to the collective-bargaining process"); *County of Cook (Provident Hospital) v. Illinois Labor Relations Board,* 369 Ill. App. 3d 112, 124 (2006) (*Cook County*); *One Equal Voice,* 333 Ill. App. 3d at 1042.

¶ 69      In the case at bar, the County asks us to review the ALJ's and the Board's finding that RSAs are not confidential employees under the authorized access test. The ALJ found, in his recommended decision adopted by the Board, that although the County demonstrated that RSAs have access to information "possibly sensitive or of interest to a union," that information was "not shown to be specifically pertinent to the Employer's collective bargaining strategy."

¶ 70      On appeal, the County argues that this finding is clearly erroneous because RSAs have authorized access to confidential information that would divide the RSAs' loyalties between HHS and the Union during collective bargaining negotiations. The County argues that RSAs have access to this confidential information through (1) their role in the grievance process, and (2) their routine use of the TALEO database that contains information regarding HHS' job vacancies, hiring needs, employee salary information, and job requirements for individual

positions. However, for the following reasons, we do not find that the Board clearly erred in finding that RSAs are not confidential employees under the authorized access test.

¶ 71     The County relies exclusively on two facts to support its argument that the Board erred. First, the County emphasizes that RSAs have access to employee information through TALEO, including salary information and knowledge of future vacancies. Second, the County points to the fact that RSAs access to "information regarding grievances, the disposition of grievances and hiring matters" by working with the labor team to resolve grievances. In the County's view, this information, if provided to the Union, would grant it an unfair advantage in collective bargaining negotiations against HHS. These facts, however, as considered under Illinois case law, do not support the County's position that RSAs are confidential employees under the authorized access test.

¶ 72     The County principally relies on *Wilmette*, 366 Ill. App. 3d 830, in support of its position that RSAs are confidential employees because of their authorized access to confidential information. In *Wilmette*, we affirmed the Illinois Educational Labor Relations Board's finding that a network manager was a confidential employee, in part because his job required that he "sees, manipulates, reads and develops reports from all data on all district computers, including confidential material pertaining to labor relations." *Wilmette*, 366 Ill. App. 3d at 835-36. The information available to him through the computer system included " 'negotiations proposals, Board meeting minutes and costing data for collective bargaining in identifiable files.' " *Wilmette*, 366 Ill. App. 3d at 832.

¶ 73     In the case at bar, we do not find that *Wilmette* compels the conclusion that the Board clearly erred when it found that RSAs are not confidential employees. First, the type of data the network manager could access in *Wilmette* was much more closely related to the

20

employer's collective bargaining strategy than the information RSAs have access to through grievance proceedings or TALEO. Whereas the confidential network manager in *Wilmette* had access to negotiations proposals, Board meeting minutes, and collective bargaining costing data, the RSAs in the case at bar have access only to individual employee salary data, and knowledge of some job vacancies before they are posted. As the Board noted in its order, any information that RSAs could access relating to grievances would also be available to the Union, and is therefore not confidential. While potentially of interest to the Union, the types of information RSAs may access is not as closely connected with their employer's collective bargaining strategy as the negotiation proposals, board meeting minutes, and collective bargaining costing data in *Wilmette*.

¶ 74    Second, it is difficult to effectively analogize *Wilmette* with the case at bar due to the highly deferential standard of review by which we are bound when reviewing administrative decisions. In that case, we could overturn the board's classification only if we found that it was clearly erroneous. We are obligated to pay the same deference to the Board's finding in this case that RSAs are *not* confidential employees.

¶ 75    Rather than adopting the County's view that the information RSAs may access demonstrates the Board's clear error, we affirm the Board's finding that, while the information is potentially of interest to the Union as it approaches the negotiating table, it does not provide RSAs with genuine insights into HHS' collective bargaining strategy. "[I]nformation that may be relevant to collective bargaining, but does not reveal bargaining strategies *** is generally not considered to be confidential within the meaning of Section 3(c) of the Act." *American Federation of State, County & Municipal Employees, Council 31*, 26 PERI ¶ 114 (ILRB Local Panel 2010) (citing *Chief Judge*, 218 Ill. App. 3d at 699-701).

¶ 76  Accordingly, we cannot say that the Board clearly erred in finding that RSAs are not confidential employees under the authorized access test.

¶ 77           VI. Conclusion

¶ 78  For the foregoing reasons, we affirm the order of the Board. We cannot find that the Board's decision was either clearly erroneous or against the manifest weight of the evidence.

¶ 79  Affirmed.